**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Veronica Arnold, on behalf of herself and all other persons similarly situated, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> Arizona Department of Public Safety ("DPS"), et al., <br><br> Defendants. | No. CV-01-1463-PHX-LOA <br><br> **ORDER** |

This matter arises on Plaintiffs' Motion for Approval of Proposed Settlement Agreement. The Court has conducted a preliminary hearing, notified the class of the Agreement, and conducted a final fairness hearing. For the reasons set forth below, the Court finds that the Settlement Agreement is fair, adequate and reasonable and, therefore, will approve the Settlement Agreement.

**BACKGROUND**

On August 6, 2001, eleven named Plaintiffs brought this action against the Arizona Department of Public Safety ("DPS") and several individual defendants including the Governor of Arizona, the Director of DPS, and several DPS patrol officers.[1] (docket # 1) The

---

[1] The Original Complaint named the following plaintiffs: Veronica Arnold, Tonya Arrington, Anthony Dorset, Vince Edwards, Barrington Folks, Jim Lee, Jesus Sagrero, Raul Salazar, Greg Stephen, Jason Thiel and Frank Vilas. (docket # 1) Subsequently, Plaintiffs' counsel advised the Court that Tonya Arrington and Jason Thiel died and that Barrington Folkes has been deported and no longer wishes to pursue this litigation. The Court, therefore, granted Plaintiffs leave to file an Amended Complaint to include the appropriate named Plaintiffs.

1 named Plaintiffs include African-American and Hispanic individuals who were stopped, detained, and searched by DPS officers and drug-detection dogs while traveling on the interstate highways in northern Arizona. (Id. at 11-12)

Plaintiffs allege that Defendants maintain a policy, pattern, and practice of targeting Hispanic and African-American drivers in conducting traffic stops, detentions, and searches. This practice is commonly referred to as "racial profiling." Plaintiffs define racial profiling "as the reliance on race, skin color, and/or ethnicity as an indication of criminality, reasonable suspicion or probable cause, except when part of a description of a suspect, and said description is timely, reliable and geographically relevant." (docket # 58 at 7) The named Plaintiffs allege that racial profiling occurred while they were traveling on interstate highways I-17 and I-40 in Coconino County, Arizona. (docket # 81 at 17) Plaintiffs allege that racial profiling stems from a federally funded drug interdiction program sponsored by the United States Drug Enforcement Agency known as "Operation Pipeline." (docket # 1 at 17-18) Plaintiffs assert violations of their constitutional rights under the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 C.F.R. § 42.101, et seq. (Id. at 11) Defendants deny any racial profiling by DPS officers and assert that Plaintiffs' constitutional rights have not been violated. (docket # 18)

Plaintiffs' suit is based in large part on a statistical study performed by one of Plaintiffs' expert witnesses, Dr. Frederic I. Solop, Director of the Social Research Laboratory at Northern Arizona University, in connection with ongoing criminal litigation in Coconino County. Dr. Solop's study is based on documents memorializing traffic stops during 2000 which were produced pursuant to a discovery order by the Coconino County Superior Court in the State criminal litigation. During 2002, it was discovered that DPS had either lost or destroyed certain documents regarding traffic stops and vehicle searches. Based on the absence of the DPS stop and search data, which was critical to Plaintiffs' case, on April 14, 2003, the

---

(docket # 78 at 15) In accordance with the Court's Order, Plaintiffs filed an Amended Complaint which includes the proper Plaintiffs. (docket # 81) The Amended Complaint contains no substantive changes.

District Court dismissed Plaintiffs' Complaint with leave to re-file if Plaintiffs discovered additional evidence of racial profiling by DPS. The district court dismissed the action before determining whether to certify a Plaintiffs class.

Plaintiffs appealed. While on appeal, the parties agreed to participate in mediation conducted by Stephen Liacouris of the Ninth Circuit Court of Appeals Mediation Program. Mediation began on September 24, 2003 and continued until the parties reached a settlement of the issues raised in Plaintiffs' complaint in January of 2005. After the parties reached an agreement, they filed a stipulation with the Ninth Circuit to dismiss the pending appeal without prejudice to its reinstatement, so that jurisdiction could be re-vested in the District Court and the matter could be remanded for approval of the settlement. The Ninth Circuit dismissed the appeal without prejudice and remanded this matter for review and approval of the settlement agreement. Thereafter, all parties expressly consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636 (c). (docket # 61) After resolving the novel question of whether a magistrate judge has jurisdiction to preside over a class action (docket # 67), Arnold v. Arizona Department of Public Service, 233 F.R.D. 537 (D. Ariz. 2005), Plaintiffs moved for certification of a Plaintiffs Class pursuant to Fed.R.Civ.P. 23(b)(2) and approval of the Settlement Agreement

## **PROPOSED SETTLEMENT AGREEMENT**

In summary, the proposed Settlement Agreement contains the following terms:

**Prohibition of Racial Profiling and Racial Discrimination**: DPS will maintain its present policy that the intentional practice of racial profiling is unlawful. DPS will not tolerate the racial or ethnic profiling of any group and prohibits any policy, procedure or practice that constitutes profiling any person based on race, skin color, and/or ethnicity for the purpose of traffic stops or investigation. On or before the effective date of the Settlement Agreement, DPS will implement General Order 4.2.30 which defines racial profiling and prohibits its officers from using race, skin color, or ethnicity in developing reasonable suspicion or probable cause for a vehicle stop. (docket # 58, Exh. 1 at 7)

**Modification of Traffic Stop Procedures**: An officer shall not detain a vehicle or its occupants for investigative purposes for longer than is reasonably necessary to accomplish the purpose of the traffic stop unless reasonable suspicion or probable cause of criminal activity exists. An officer shall not detain a vehicle or its occupants for the sole purpose of allowing time for the arrival or use of a drug-detection canine unless reasonable suspicion or probable cause of criminal activity exists. (docket # 58, Exh. 1 at 8)

**Limitation on Consent Searches:** Before conducting a consent search of a vehicle during a traffic stop, an officer shall obtain written consent-to-search the vehicle and provide a copy of the consent form to the owner or driver of the vehicle. DPS officers shall not have the discretion to decline to use a written consent to search form because the officer deems the use of forms to be inconvenient or time-consuming, or because the officer does not have the form available. (Id. at 8)

**Videotaping of Traffic Stops**: DPS will adopt procedures which will provide that all traffic stops and vehicle searches will be videotaped using in-car videotape systems. The systems shall have both video and audio components, will be activated once a traffic stop has begun, and are to remain in operation throughout the duration of the traffic stop. DPS will make good faith efforts to install the vehicle-based systems in all patrol vehicles as soon as is reasonably possible. Until all patrol cars have vehicle-based video systems, DPS will prioritize its assignment of new equipment where the greatest number of traffic stops and vehicle searches occur. (Id. at 9-10)

**Training:** DPS will train all of its sworn officers regarding the terms of the Settlement Agreement. DPS will also train every DPS officer in a racial profiling curriculum agreed to by the parties, and DPS will provide Plaintiffs' representative with documentation showing that this requirement of the Settlement Agreement has been fulfilled. (Exh.1 to docket # 58 at 10 and Racial Profiling Training Outline thereto)

**Data Collection**: DPS will collect and make available data the parties agreed is meaningful regarding DPS' contacts with the motoring public for a period of three years from the date the Settlement Agreement becomes effective, viz. the date upon which the Clerk enters

the dismissal of this case. This data will be automated and will be made available to Plaintiffs' representative, the American Civil Liberties Union of Arizona, on a semi-annual basis at no cost. DPS will provide the data for all traffic stops and vehicle searches, which are conducted by DPS, during that three-year time period.  Thereafter, the stop and search data will continue to be available to the public pursuant to Title 39, Chapter 1, Article 2 of the Arizona Revised Statutes. (Id. at 10-13)

**Implementation and Compliance with Settlement Agreement**: The Assistant Director, Agency Support Division, will oversee and be responsible for DPS' implementation of the terms of the Settlement Agreement.

**Verification:** Plaintiffs' counsel may call face-to-face meetings with DPS to discuss DPS' efforts to implement the terms of the Settlement Agreement on a bi-annual basis. Counsel will also have access to policy manuals, training materials, and the automated data regarding its officers' contacts with motorists. (Id.)

**Mediation:** The parties agree to make a good faith effort to resolve any disputes by direct negotiation. (Id. at 18)

**Citizens' Advisory Board:** The Governor will create and appoint a nine-member "Citizens' Traffic Stop Advisory Board" which will review DPS' practices, policies, and procedures relating to racial profiling, traffic stops, traffic stop data collection, and vehicle searches. (Id. at 16-17)

**Plaintiffs' Claims**: The Agreement shall extend to all claims of the named Plaintiffs, and to the injunctive and declaratory claims of the Plaintiff class. As of the effective date of the Agreement, all damages claims of the named Plaintiffs shall be dismissed with prejudice. The Settlement Agreement has no impact on, or prejudicial effect as to, the damages claims of unnamed individual class members. (Id. at 5)

**Future Lawsuits:** Plaintiffs agree that as long as DPS complies with the Settlement Agreement, neither they nor their representative, while the agreement is in effect, will initiate or participate in any new suit or action against DPS seeking relief as to the policies and practices complained of in the Complaint and/or which are covered by this Agreement,

except that unnamed individual class members may pursue damage claims. (docket # 58, Exh. 1 at 6)

**No Admissions**: Defendants do not admit any violations of state or federal law or admit any wrongdoing.  Likewise, the Agreement shall not be deemed an admission by Plaintiffs that no wrongdoing was engaged in by Defendants or that Defendants complied with applicable federal or state law.  (Id. at 4)

**Attorneys' Fees and Costs**: In full settlement of all claims for attorneys' fees, DPS will pay $139,589.78 denominated in the Settlement Agreement as attorneys' fees and costs.  (Id.)

**Dismissal**: This litigation will be terminated by a dismissal with prejudice by Stipulated Order of Dismissal pursuant to Fed.R.Civ.P. 41(1)(2). (docket # 58, Exh. 1 at 21)

**Duration of Agreement:** The Agreement shall terminate three years after the effective date thereof.  (Id., Exh. 1 at 6)

### PROCEDURE FOR REVIEW OF CLASS ACTION SETTLEMENT

Federal Rule of Civil Procedure 23(e) provides that the "court must approve any settlement . . . of the claims, issues, or defenses of a certified class."  A district court reviewing a proposed settlement agreement in a class action engages in a three-step process: (1) conduct a preliminary hearing, (2) notify the class, and (3) conduct a fairness hearing.  In re Jiffy Lube Securities Litigation, 927 F.2d 155, 158 (4th Cir. 1991).  Thereafter, the court approves or rejects the settlement agreement.  Because settlement was reached in this case before certification of the class, during the preliminary hearing, the Court determined whether to certify the class and preliminarily approved the Settlement Agreement.  Staton v. Boeing Company, 327 F.3d 938, 952 (9th Cir. 2003).  The Court will discuss the three-step process followed in this case below.

**I. Preliminary Hearing and Class Certification**

The Court conducted a preliminary hearing on February 8, 2006 to determine whether to certify the class and preliminarily approve the Settlement Agreement. After consideration of the relevant pleadings and the arguments of counsel, the Court certified Plaintiffs' class and preliminarily approved the Settlement Agreement. Specifically, the Court

found that Plaintiffs satisfied the requirements for certifying a class pursuant to Fed.R.Civ.P. 23(b)(2) and 23(a).[2] The Court found that the proposed class satisfied the four prerequisites set forth in Federal Rule of Civil Procedure 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). (docket # 78 at 3-8)  The Court also found that Plaintiffs satisfied the requirement of Fed.R.Civ.P. 23(b)(2) that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." (Id. at 8) Accordingly, pursuant to Fed.R.Civ.P. 23(b)(2) the Court certified the following class for purposes of settling all claims for relief in Plaintiffs' Complaint:

> All non-Caucasian persons who have been or will be stopped, detained and/or searched by an officer or officers of the Arizona Department of Public Safety ("DPS") while traveling in a vehicle on a street or highway within Arizona between January 1, 1997, and the date which is three calendar years after the effective date of the Settlement Agreement filed with the Court on April 12, 2005.

(docket # 78 at 14)

At the conclusion of the preliminary hearing, the Court appointed Lee B. Phillips, Daniel Pochoda, and Reginald T. Shuford as class counsel pursuant to Fed.R.Civ.P. 23(g). (docket # 78)  The Court also preliminarily approved the Settlement Agreement subject to a final fairness hearing.  (Id. 78 at 14); In re Jiffy Lube Sec. Litig., 927 F.2d at158. The Court determined that the proposed Settlement Agreement seemed fair on its face and worth submitting to the class members for their consideration. Managing Class Action Litigation, Barbara J. Rothstein & Thomas E. Willging (2005), at 17.

**II.  Notice to Class Members**

Following the preliminary approval of the Settlement Agreement and certification of the class, the Court ordered the parties to submit to the Court a proposed notice to be given to the class members including the form of the notice to the media pursuant to which the notice

---

[2] The Court will not reiterate its analysis of the class certification issue in this order. Rather, the Court incorporates by reference its February 24, 2006 Order. (docket # 78)

- 7 -

would be disseminated. (docket # 79)  The Court noted Rule 23(e)'s requirement that the district court "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement . . . ." (docket # 79 at 1)

The parties submitted a proposed form of notice which the Court approved on March 27, 2006. (docket # 84)  The notice describes the essential terms of the Settlement Agreement, provides information regarding attorneys' fees, indicates the time and place of the hearing to consider approval of the Settlement Agreement, prominently displays the address and phone number of counsel and the procedure for making inquires or objections regarding the Settlement Agreement. (docket # 79, # 84 and # 92)

Although the Court approved the content of the notice, in a subsequent order, the Court found that the parties' proposal for publishing the notice was inadequate to reach the following communities: Arizona's Indian tribes; Arizona's African-American, Arab-American, and Asian-American residents; Arizona's Spanish-speaking-only residents, and the Western and Eastern portions of the District of Arizona. (docket # 85)  The Court, therefore, expanded the list of media outlets through which notice would be disseminated to ensure that the notice would reasonably reach the foregoing groups of individuals. (Id.)  The Court's March 28, 2006 Order contains an extensive list of media outlets that would publish or otherwise disseminate the notice. (docket # 85)  The Court will not reiterate that list, or the form of notice, here.  Rather, the Court incorporates by reference its March 27, 2006 and March 28, 2006 Orders. (docket # 84 and # 85)

After the parties reached an agreement regarding the cost of notice, on May 5, 2006, the Court ordered that the notice be disseminated via the outlets listed in its March 28, 2006 Order. (docket # 88)  On July 21, 2006, the parties confirmed that the notice had been disseminated in accordance with the Court's Order. (docket # 92)  No objections have been filed to the proposed Settlement Agreement and the July 14, 2006 deadline for filing objections has passed.  Additionally, no class members attended the fairness hearing conducted on July 28, 2006.

**III. Fairness Hearing**

On July 28, 2006 at 2:00 p.m., the Court conducted a final fairness hearing in open court. Various counsel and party representatives attended the hearing. No class members appeared; no objections to the Settlement Agreement were expressed. After consideration of the proposed Settlement Agreement, the record in this matter, including the written arguments of counsel, the Court finds that the Settlement Agreement is "fair, reasonable, and adequate," and therefore, the Court approves the Settlement Agreement as discussed below.

**IV.     Final Review of Settlement Agreement**

**A. Summary of Terms of Proposed Settlement Agreement**

As previously discussed, the Settlement Agreement's terms: (1) prohibit DPS from engaging in racial profiling and racial discrimination in conducting traffic stops and investigation; (2) limit the length of traffic stops; (3) require written consent to conduct a search of a vehicle; (4) require DPS to adopt procedures for videotaping traffic stops; (5) require DPS to train its officers regarding the terms of the Settlement Agreement; (6) permit Plaintiffs' counsel to request meetings with DPS to monitor the implementation of the Settlement Agreement; (7) require the Governor to create a Citizens' Traffic Stop Advisory Board to review DPS' practices regarding traffic stops; (8) provide that the named Plaintiffs release their claims for monetary damages but that the unnamed Plaintiffs may seek such damages; (9) provide that DPS will pay $139,589.78 as attorneys' fees and costs to Plaintiffs' counsel. (Exhibit to docket # 58)

**B. Legal Standard for Approving Settlement Agreement**[3]

In the context of a class action, "the extraordinary amount of judicial and private resources consumed by massive class action litigation elevates the general policy of

---

[3]     The Class Action Fairness Act of 2005 ("CAFA") addresses federal diversity and removal jurisdiction over multi-state class actions, procedures for settlement and related issues. The CAFA was enacted on February 18, 2005, nearly four years after this case was commenced on August 6, 2001.

There is no dispute that the terms of the CAFA do not apply retroactively to this case. Section 9 of CAFA, 109 Pub.L. 2, 5 (stating that the "amendments made by this Act shall apply to any civil litigation commenced on or after the date of enactment of this Act.").

1 encouraging settlements to 'an overriding public interest.'" <u>Austin v. Pennsylvania Department
2 of Corrections</u>, 876 F.Supp. 1437, 1455 (E.D.Pa. 1995)(quoting <u>Cotton v. Hinton</u> 559 F.2d
3 1326, 1331 (5th Cir. 1977)). Due to their representative nature, class actions are susceptible to
4 abuse by named plaintiffs or their counsel. <u>Id</u>. To protect against improper conduct, Federal
5 Rule of Civil Procedure 23(e) provides that "[t]he court must approve any settlement . . . of the
6 claims . . . of a certified class." Fed.R.Civ.P. 23(e)(1)(A).

Specifically, Rule 23(e) provides, in pertinent part, that:

> (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
>
> (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
>
> (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.
>
> (2) The parties seeking approval of the settlement, voluntary dismissal, or compromise under Rule 23(e)(1) must file a statement identifying any agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.
> * * *
> (4)(A) Any class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A).

17 Fed.R.Civ.P.23(e). The parties have previously filed "a statement identifying any agreement
18 made in connection with the proposed settlement." <u>Id</u>. Namely, the parties filed the proposed
19 Settlement Agreement which the Court preliminarily approved. Additionally, as discussed
20 above, the Court directed "notice in a reasonable manner to all class members who would be
21 bound by [the] proposed settlement . . . ." Fed.R.Civ.P. 23(e)(1)(B). The Court invited
22 objections from class members and conducted a fairness hearing to consider whether the
23 Settlement Agreement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). Below,
24 the Court will discuss its findings that the proposed Settlement Agreement satisfies that
25 standard.

**C. Whether Settlement Agreement is "Fair, Reasonable, and Adequate"**

27 In determining whether the proposed agreement is fair, reasonable, and adequate,
28 the district court must consider the settlement as a whole, rather than individual provisions, for

- 10 -

overall fairness. Staton v. Boeing Company, 327 F.3d 938, 952 (9th Cir. 2003)(citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).  In making this determination, a court may consider the following factors:

> the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action throughout trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Molski v. Gleich, 318 F.3d 937 (9th Cir. 2003)(quoting Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998)).  A district court, however, need not only consider those factors which are relevant to the case before it "[b]ecause the settlement evaluation factors are non-exclusive." Churchill Village, L.L.C. v. General Electric, 361 F.3d 566, 576 n. 7 (9th Cir. 2004).  The district court must consider the relevant factors but need not "reach any ultimate conclusions on the contested issues of law and fact which underlie the merits of the dispute, for it is the very uncertainty of the outcome of litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." Officers for Justice v. Civil Serv. Comm'n., 688 F.2d 615, 625 (9th Cir. 1982); Hanlon, 150 F.3d at 1026.  The Court will discuss the relevant factors in determining whether to approve the Settlement Agreement.

### 1. Risk and Expense of Further Litigation

The likelihood and expense of continued litigation weighs in favor of approving the Settlement Agreement.  The parties have advised the Court that if the Settlement Agreement is not approved, they will continue litigating this matter before the Ninth Circuit.  If this matter were reversed at the appellate level and remanded, the parties agree that this matter would involve numerous depositions, additional discovery, dispositive motions, and possibly a trial. In view of the number of named Plaintiffs, the enormous size of the proposed class, the significant cost of continued litigation, and the inordinate delay that has already occurred in this matter, the mandates of Federal Rule of Civil Procedure 1 heavily favor approval of the Settlement Agreement.  Fed.R.Civ.P. 1 (encouraging the "just, speedy, and inexpensive determination of every action.") Additionally, the "compromise of complex litigation is

1 encouraged by the courts and favored by public policy." <u>Wal-Mart Stores, Inc. v. Visa U.S.A.,</u>
2 <u>Inc.</u>, 396 F.3d 96 (2nd Cir. 2005).

### 2. The Amount Offered in the Settlement Agreement

Plaintiffs' purpose in bringing this action was to obtain injunctive relief to prevent the continuation of DPS's alleged racial profiling during routine traffic stops on Arizona highways. The Court finds that the terms of the Settlement Agreement resolve Plaintiffs' claims and provide Plaintiffs with the relief sought.

Pursuant to the terms of the Settlement Agreement, Defendants offer Plaintiffs a substantial benefit through the commitment of resources to implement terms of the Settlement Agreement which are designed to further the goal of prohibiting racial profiling by DPS in Arizona and to involve citizens in the oversight of DPS. Implementing the terms of the Settlement Agreement will require an ongoing commitment of Defendants' resources to programs designed to eradicate racial profiling. The entire class will benefit from Defendants' dedication of resources to the implementation of the terms of the Settlement Agreement pursuant to which Defendants agree to take the following action: prohibit racial profiling, equip DPS vehicles with videotaping equipment; limit consent searches; collect data regarding traffic stops and convert that data to an automated format accessible to Plaintiffs at no cost; train DPS officers regarding the terms of the Settlement Agreement, including the prohibition of racial profiling; and create a Citizens' Advisory Board. In summary, pursuant to the Settlement Agreement, Defendants agree to dedicate human and financial resources to ensure that racial profiling does not occur on Arizona highways which is the relief that Plaintiffs sought in filing this action.

### 3. Extent of Discovery Completed

This matter has been litigated since 2001 and the parties have engaged in extensive discovery. The parties have reviewed thousands of traffic stops and vehicle searches conducted by DPS in 1999-2002 and over 500,000 stops conducted by DPS in 2003. (docket # 59 at 18 n. 5) This matter was on appeal and in mediation from 2003 until January of 2005. The procedural posture of this case supports approving the Settlement Agreement. The parties

have spent a significant amount of time considering the issues and facts in this case and are in a position to determine whether settlement is a viable alternative. As discussed in more detail below, counsel for both Plaintiffs and Defendants have sufficient skill and experience to litigate this class action and evaluate the propriety of the Settlement Agreement. (docket # 68)

### 4. The Experience and Views of Counsel

Another relevant factor is the experience of counsel who determined that settlement was appropriate in this matter. Lee B. Phillips, Daniel Pochoda, and Reginald T. Shuford are class counsel in this case. Each of these attorneys has considerable experience in the applicable area of the law and in handling similar actions.

Lee Phillips has 22 years of experience in civil rights law and has been involved in racial profiling issues in Arizona for over six years. (docket # 68 at 5-6, 8-9) In 1999-2001, he identified and investigated potential claims in this action in conjunction with the American Civil Liberties Union ("ACLU"). (Id.)  Additionally, Mr. Phillips has worked as a specialist in criminal law and his practice consisted largely of defending individuals arrested by DPS for illegal transportation of drugs on Arizona highways. (Id.)  Mr. Phillips' work successfully led to the Arizona Supreme Court's decision in Jones, et al. v. Sterling, 210 Ariz. 308, 110 P.3d 1271 (Az. 2005) where the Arizona Supreme Court decided, among others, that a selective enforcement claim can provide a constitutional defense to a criminal charge in the context of a traffic stop and vehicle search. (Id. at 6)

Mr. Phillips was also lead counsel in Manybeads v. United States, 209 F.2d 1164 (9th Cir. 2000), cert. denied, 532 U.S. 966 (2001), a class action filed on behalf of Navajo individuals who objected to being relocated by the federal government. The Ninth Circuit directed the parties to participate in its mediation program. (docket # 68 at 9)  After several years of mediation, the parties reached an agreement which Congress approved in 1996. (Id.) Thus, Mr. Phillips has previous experience with the Ninth Circuit's mediation program in which the parties participated in this case.  Mr. Phillips has also worked on several other class actions lawsuits set forth in detail in a previously filed memorandum. (docket # 68 at 9)

1  Reginald Shuford is an attorney for the ACLU's national office. (docket # 68 at
2  7) He has worked on civil rights litigation including a high-profile highway patrol racial
3  profiling case entitled <u>Maryland State Conference of NAACP Branches v. Maryland State</u>
4  <u>Police</u>, 72 F.Supp.2d 560 (D.Md. 1999). Mr. Shuford has also litigated cases involving racial
5  profiling of airline passengers and racially selective law enforcement. (docket # 68 at 7)
6  Finally, he has been published on the topic of racial profiling. <u>Anyway You Slice It: Why</u>
7  <u>Racial Profiling is Wrong</u>, St. Louis University Law Review, Fall 2000.

8  Daniel Pochoda is an attorney for the ACLU of Arizona. He has litigated civil
9  rights and racial discrimination matters in federal court since he began working for the Civil
10 Rights Division of the United States Department of Justice, 1967- 1969. (docket # 68 at 7) Mr.
11 Pochoda was class counsel in <u>Inmates of Attica Correctional Facility v. Rockefeller</u>, 453 F.2d
12 12, 15-19 (2nd Cir. 1971), which resulted in a significant ruling that the voluntary cessation of
13 torture and brutality toward prisoners does not obviate the need for injunctive relief. He has
14 served as a special master in the United States District Court, District of Arizona in three class
15 action cases involving constitutional issues: <u>Casey v. Lewis</u>, CV-90-00054-PHX-RGS and CV-
16 91-1808-PHX-RGS; <u>Gluth v. Arizona Department of Corrections</u>, CV-84-1626-PHX-PGR; and
17 <u>Hook v. Arizona</u>, CV-73-97-PHX-SMM. Recently, Mr. Pochoda won a racial profiling case
18 in <u>Oziwo v. Town of Paradise Valley</u>, CV-03-1793-PHX-MHM. He has also taught
19 constitutional law and litigation and trial advocacy on the law faculties of New York University
20 School of Law, the City University of New York School of Law, and Santa Clara University
21 Law School. (docket # 68 at 8)

22 The Court finds that Plaintiffs' counsel in this matter have significant knowledge
23 and experience to appropriately assess the legal and factual issues in this matter and determine
24 whether the Settlement Agreement herein serves the interests of the class members.

25 **5. Reaction of Class Members**

26 As previously discussed, sufficient and reasonable notice was given to the class
27 members regarding the proposed Settlement Agreement. The notice included specific
28 instructions regarding objecting and/or attending the July 28, 2006 Fairness Hearing. The notice

was disseminated via numerous media outlets in English and Spanish. (docket # 85) The notice fairly apprized the class members of the terms of the Settlement Agreement and the class members' options. Although sufficient notice of the proposed Settlement Agreement was published in numerous media outlets throughout the District of Arizona including to many of Arizona's Native American tribes and organizations dedicated to eliminating unlawful discrimination, not a single class member filed an objection or attended the Fairness Hearing. The absence of any objections suggests that the class members are unopposed to terms of the Settlement Agreement. The absence of objections weighs in favor of approving the Settlement Agreement.

### 6. Absence of Evidence of Collusion

Another factor to consider in determining whether to approve the Settlement Agreement is whether there is evidence of collusion among the parties. Ficalora v. Lockheed Cal. Co., 751 F.2d 995, 997 ( 9th Cir. 1985) (stating that "[b]efore approving a class action settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties. . . .")

There is no evidence of collusion in this case. The settlement negotiations were conducted at arms length. Counsel participated in settlement discussions which were facilitated by a neutral Ninth Circuit mediator, the parties exchanged draft settlement proposals, and arrived at a final agreement. (docket # 59) The record reflects that the parties litigated this matter for several years before reaching settlement with the assistance of a mediator. The parties, including counsel for Plaintiffs, DPS, the Attorney General's Office, and the Governor's Office, spent over a year discussing the issues in this case and negotiating the Settlement Agreement. Additionally, as previously discussed, Plaintiffs' counsel conducted extensive discovery in the related State criminal cases which provided evidence of traffic stops and vehicle searches by DPS and claims of racial profiling.

Additionally, pursuant to the Settlement Agreement, counsel for Plaintiffs will receive $139,589.78 in attorneys' fees and costs based on a reduced hourly rate for fees incurred up to May 13, 2004. (docket # 59 at 15-16) Plaintiffs' counsel have agreed to forego payment

1 for legal services after that date if the Settlement Agreement is approved. Plaintiffs' counsel 2 have been vigorously pursuing this action since, at least, August of 2001 when this matter was 3 filed. They have participated in mediation and are committed to continuing with this litigation 4 if the Settlement Agreement is rejected. In view of the reduced fees and the significant amount 5 of time expended by Plaintiffs counsel since 2001, it is clear that Plaintiffs' counsel are not 6 pursuing this litigation for personal financial gain.

7 In summary, there is no evidence of collusion, fraud, or overreaching that would 8 weigh against approving the Settlement Agreement. The arms-length negotiation of the 9 Settlement Agreement favors approval of that agreement. Wal-Mart Stores, Inc., 396 F.3d at 10 116-117 (stating that "a presumption of fairness, adequacy, and reasonableness may attach to 11 a class settlement reached in arms-length negotiations between experienced, capable counsel 12 after meaningful discovery.") (citations omitted).

### 7. Attorneys' Fees

14 The Settlement Agreement provides for the payment of reasonable fees and costs 15 to Plaintiffs' counsel. Generally, attorneys' fees provisions included in settlement agreements 16 are subject to the determination of whether the agreement is "fair, adequate, and reasonable." 17 Fed.R.Civ.P. 23(e). The assumption in scrutinizing a class action settlement agreement is that 18 the class members have an interest in assuring that the fees to be paid class counsel are not 19 unreasonably high. Staton, 327 F.3d at 964. "If fees are unreasonably high, the likelihood is that 20 defendant obtained a economically beneficial concession with regard to the merits provisions, 21 in the form of a lower monetary payments to the class members or less injunctive relief for the 22 class than could otherwise be obtained." Id. Thus, the "'[district] court must exercise its inherent 23 authority to assure that the amount and mode of payment of attorneys' fees are fair and proper.'" 24 Id. at 964 (quoting Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328-29 (9th Cir. 25 1999)). The district court should determine whether the attorneys fees provided for in the 26 Agreement will compensate counsel sufficiently for the reasonable value of services. Lindy 27 Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 28 161, 167 (3rd Cir. 1973). The Ninth Circuit has instructed that because the amount of fees is

1  often open to dispute and because the parties are compromising to avoid further disputes, the
2  district court need not inquire into the reasonableness of fees with the same level of scrutiny as
3  when the amount of fees is litigated. <u>Staton</u>, 327 F.3d at 966.  The district court, however, must
4  conduct some inquiry into the hours expended and the billing rate.

5  Here, Defendants have agreed to pay Plaintiffs' counsel $139,589.78 for attorneys'
6  fees and costs. To facilitate the Settlement Agreement, Plaintiffs' counsel agreed to substantially
7  reduce their hourly rate and to waive any claim for fees and costs after May 10, 2004, even
8  though a significant amount of attorney time and costs were incurred after that date.

9  Counsel for Plaintiffs have expended over 508 hours pursuing this litigation from
10 March 15, 2001, when work on this case began, to May 10, 2004. (docket # 93, ¶ 5) At the rate
11 of $250 per hour, which the Court finds to be a reasonable hourly rate for the experience of
12 class counsel and this kind of challenging litigation, Plaintiffs have incurred fees through May
13 10, 2004 of $127,162.50 (508.65 hours x $250 per hour).  (<u>Id</u>.)   Class counsel have also
14 expended law clerk fees of $16,050 (214 hours x $75 per hour) and incurred costs and expenses
15 of $46,993.06. (<u>Id</u>.) Thus, total fees and costs through May 10, 2004 incurred were $190,205.56.
16 Nothing in the record suggests that the number of hours or hourly rates are unreasonable.
17 Rather, the opposite is true.  Moreover, class counsel have vigorously litigated this matter since
18 May 10, 2004 on a <u>pro bono</u> basis and have expended significant time on this case since it was
19 remanded back to the district court on February 10, 2005. Counsel agreed to a reduction of their
20 hourly rate and to a substantial reduction of the number of hours for which they are
21 compensated in order to facilitate the resolution of this matter. Considering all the time class
22 counsel expended in this case to date, Mr. Phillips estimates that class counsel are actually being
23 compensated at the effective rate of $100 per hour for their legal work in this case.  (Id. at ¶ 7)
24 The Court finds that amount of fees of $139,589.78 awarded Plaintiffs' counsel is fair,
25 reasonable and proper. <u>Zucker,</u> 192 F.3d at 1328-29.

## **SUMMARY**

27 In conclusion, the Court finds that the Settlement Agreement is fair, adequate and
28 reasonable.  The terms of the Settlement Agreement address Plaintiffs' grievances set forth in

- 17 -

1  the Complaint — allegations of racial profiling by DPS in performing traffic stops — by
2  requiring Defendants to implement and maintain programs that support the prohibition of racial
3  profiling by DPS officers and to put in place tools to facilitate the monitoring of those programs
4  by Plaintiffs and the public.  There is no evidence of collusion among the parties or that counsel
5  brought this action solely for personal financial gain.  Rather, Plaintiffs' counsel have sacrificed
6  the potential for earning a greater award of attorneys' fees and costs in the interest of settling
7  this matter for the benefit of the class members.  After a thorough review of the record in this
8  matter, all the relevant factors for a district court to consider in approving a class action
9  settlement and the absence of any objections to the Settlement Agreement, the Court approves
10 the Settlement Agreement.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Approval of Settlement Agreement (docket # 58) is **GRANTED.**

DATED this 31st day of July, 2006.

_____
Lawrence O. Anderson
United States Magistrate Judge